**Richard WAGNER and Erie Business Center, Appellants,**

v.

**CITY OF ERIE ZONING HEARING BOARD and Community Shelter Services, Inc.**

Commonwealth Court of Pennsylvania.

Argued March 13, 1996.

Decided May 2, 1996.

---

Randy L. Shapira, for Appellants.

Edwin W. Smith, for Appellee.

Before COLINS, President Judge, and DOYLE, McGINLEY, PELLEGRINI, FRIEDMAN, KELLEY and FLAHERTY, JJ.

DOYLE, Judge.

Richard Wagner and the Erie Business Center (collectively, Erie Business) appeal from the order of the Court of Common Pleas of Erie County which affirmed the decision of the Zoning Hearing Board of the City of Erie (ZHB) to grant two variances to Community Shelter Services, Inc. (Community Services) so as to allow the conversion of an existing building located at 202 West Ninth Street in the City to a fifty-unit residence for low income and homeless persons. Community Services is a private nonprofit corporation which has a conditional sales agreement to purchase the property for $375,000.

The subject property, located in a T–1, Transitional Use Zoning District, was developed as a fifty-four-unit Travel Lodge Motel which was constructed prior to the enactment of the Erie Zoning Ordinance, No. 40–1968. The building is presently vacant but was formerly used, in addition to its first use as a motel, as a fifty-unit dormitory that housed between seventy to eighty college students.[1] The area surrounding the proper-

---

**1.** Mary Kolbe the Director of Student Services and Academics at the Erie Business Center (a two-year business college) testified before the ZHB that the Erie Business Center owns several buildings in the 200 block of West Ninth Street near the Travel Lodge Motel and owns apartment buildings in close proximity on the next street at 218, 220 and 222 West Eighth Street. She testified that between 50 and 60 students occupy the Business Center's apartment buildings, that previously she had placed students in the Travel Lodge building when it was used as a dormitory, and that it housed as many as 75 or 80 students at one time. She further testified as follows:

Q: And is your objection also then as to the fact that there [are] homeless people here as opposed to students?

A: I don't want to list it as homeless. It changes the climate of the whole area. I have been in this school for 14 years. This is predominantly a college area. Apartments around it and next to us down here are student housing. Majority of them are on West 8th Street and are student housing. One next to us on West 8th Street is student housing and a sorority house next to the building here. Climate of it is academic, definitely.

ty consists of various apartment complexes, high density residential developments including senior citizen housing, a private college, the C–3 central business district and a residential neighborhood.

Because the T–1 Transitional Use Zoning District requires one off-street parking space for each "family living unit"[2] and a minimum lot area of 1,500 square feet "per family,"[3] Community Services' application for a permit was denied by the City's zoning officer on January 18, 1994. The property had only forty-two offstreet parking spaces available[4] (fifty required) and a total lot area of only 22,700 square feet (75,000 sq. ft. required; i.e., 50 × 1,500 sq. ft.). On its application for the permit for the conversion, Community

Q: And pretty much your objection?
A: Yes.
Q: [If] Gannon University bought the property and put in 50 kids there, [would] you have any reason to object to that?
A: No.

(ZHB Hearing August 9, 1994, Notes of Testimony (N.T.) at 61; Reproduced Record (R.R) at 73a.)

Shelter described the use of the building as a "50 unit apartment building" and that such use was a "conforming" use. The Erie zoning officer denied the permit because the property "[lacked] lot area per family as set forth in Art. 2, Sec. 205 and [failed to meet] off-street parking requirement, Art. 3, Sec. 302, both part of City of Erie's zoning ordinance 40–1968." (Denial of Permit by Erie Zoning Officer, January 18, 1994.)

At no time did Community Services request a use variance from the zoning ordinance because the use of the property as a multiple family dwelling[5] was a permitted use under Section 204.13 of the City's zoning ordinance.[6]

2. Section 302 (Off–Street Parking) of the City's Zoning Ordinance provides:

| USE | PARKING SPACE REQUIRED |
|---|---|
| Dwellings | 1 per family unit |
| . . . . | |
| Dormitories | 1 per 4 beds |
| . . . . | |

3. Section 205 (Lot, Yard and Height Requirements) of the City's Zoning Ordinance provides:

| USE DISTRICTS | R–1 | R–2 | R–3 | T–1 |
|---|---|---|---|---|
| Minimum Lot Area Per Family (Square Feet) | 6,000 | 3,000 | 1,000 | 1,500 |

4. At various times throughout the hearing before the ZHB, the property had also been described as having either 31, 32 or 33 parking spaces presently available. (N.T. at 26, 33; R.R. at 38a, 45a.)

5. "Multiple Family Dwelling" is defined in Article 6 of the Zoning Ordinance as:

a building or portion thereof, designed for or occupied by three (3) or more families living independently of each other.

The term "Family" is defined in part as:

**(1) a single person occupying a dwelling unit and maintaining a household, or**
. . . .

Id. "Dwelling" is defined as:

any building or portion thereof which is designed for or used for residential purposes. The term 'Dwelling' shall not include hotels, motels, or other structures used for transient residence.

Id.

Because each single person in each dwelling unit would maintain his/her own permanent "household" in the converted motel each such person would be a "family" not only in actuality but by definition under the Zoning Ordinance.

A "hotel/motel," on the other hand, is defined under Article 6 as:

a building containing sleeping rooms **principally for the use of transients** and sometime containing accessory uses, such as kitchen and dining facilities, lounge, meeting rooms, and convention facilities and other business uses permitted within the use district. (Emphasis added.)

Because a "transient" by definition under the ordinance is an individual "residing or stopping in the City for less than 30 days at any one time," it is undisputed that after the conversion of the Travel Lodge Motel, the building would be a multiple family dwelling.

6. The following uses are permitted as of right in Section 204.13 of the Zoning Ordinance, T–1 Transitional Use District:

One-Family Dwellings
Two-Family Dwellings
**3 & 4 family Dwellings**
**Dormitories**
Fraternity/Sorority
Funeral Homes
Greenhouses/Nurseries
**Group Care Facility/(90–1980)**
Home Occupations
Medical Clinics

Mobile Homes (41–1979)
**Multiple Family Dwellings**
Nursery/Business Schools
**Nursing/Convalescent Homes**
Personal Services
Professional Services
Public/Semi–Public Use
**Rooming/Boarding Homes**
**Tourist Homes** . . . .
(Emphasis added.)

Community Services appealed the denial of its application to the ZHB. To establish that it was unable to use the building, because without the variances for area and parking the building would be rendered valueless, Community Services first presented the testimony of its architect, Thomas Freeman. He testified that bringing the building into compliance with the City's safety codes, plus the expense of renovation, would cost approximately $750,000.[7] He further testified that the cost to convert the building into a fifteen-unit multi-family dwelling to comply with the minimum lot area requirement of the zoning ordinance [8] would be an additional $864,000. Freeman opined that due to these high costs and the nature of the neighborhood in which the building is located, it would be economically infeasible to purchase the building for $375,000 and convert it into a fifteen-unit multi-family dwelling. The total cost of the conversion would be $1,989,000, or $132,600 per dwelling unit. And, under the application, only one individual could reside in each dwelling unit.

The listing real estate broker,[9] James McGoey, testified that due to the deterioration of the building, the type of building, the type of neighborhood and the existing zoning ordinance, the building would be difficult to sell to another purchaser for another use. He testified that in the past two years, only two other parties had even submitted bids on the property. One prospective purchaser, who intended to use the building for student housing, made two bids, approximately eight months apart. Although both bids were accepted by the seller, neither materialized due to the fact that the buyer was unable to secure financing. The other potential buyer, planning to use the building for student housing or for some type of social service housing, also made a bid that was accepted, but that deal failed to close as well. McGoey further testified that the building's list price had

dropped from approximately $750,000 to $375,000. Finally, he testified that if a potential buyer were forced to spend the anticipated renovation costs required to convert the building into a fifteen-unit apartment complex, the building would be essentially valueless.

To show that it would not have an adverse impact on the community, Community Services' Executive Director, Kitty Cancilla, testified that the intended purpose of the building would be to provide low-income and homeless persons with a place to live and that their average stay would be six to nine months. While she acknowledged that many prospective residents might be recovering drug and/or alcohol dependent persons, former prisoners on probation, or mentally-ill persons, she testified that the facility would maintain twenty-four-hour supervisory personnel. She also testified concerning Community Services' rigorous screening procedures, its rules and regulations, and explained that the residents who violate Community Services' policy of leading a drug and alcohol free life would be evicted from the property. Finally, she explained that a similar property in Erie, known as the Columbus Apartments and also operated by Community Services, had experienced no major problems, and that of the forty-three residents there, no more than four would have a vehicle parked in the lot at any given time.

■ In opposition to the variance, Erie Business called a number of its officers who cumulatively testified that if the building were to be used for the proposed purpose:

• it would negatively impact recruitment at Erie Business Center, a business school comprised of approximately 85% female students, because it would make the area more dangerous and less attractive to par-

---

7. Mr. Freeman testified that there were code violations because "the corridors are not separated with fire walls. Doors from apartments opening onto—from the motel units opening onto the stair towers. There are windows without fire glass in them that open to the corridors. No means of proper ventilation in quite a few units." (N.T. at 26; R.R. at 38a.)

8. Because the total area of the property was only 22,700 sq. ft., the requirement of 1,500 sq. ft. "per family" would reduce the allowable dwelling units to 15 (22,700 ÷ 1,500 = 15.133).

9. The property was owned by "Marine Bank, by merger [with] P.N.C. Bank." (N.T. at 35; R.R. at 47a.) Mr. McGoey had the property listed for sale for approximately three years. *Id.*

ents seeking a safe college neighborhood for their daughters;

• Community Shelter's drug and alcohol policy would result in residents being turned away from the shelter and would pose a threat to the neighboring community; and,

• the use of the property would alter the essential character of the neighborhood which contains a private college, a church, a parochial school, senior citizen housing and various apartment complexes.

Because of the cost of downsizing the use of the building to a fifteen-unit apartment, the Board approved the variance but with the condition that only one resident be permitted per unit and that a maximum of thirty-two residents be permitted to utilize offstreet parking.[10] Erie Business appealed to the trial court[11] which affirmed. This appeal followed.[12]

In its "Statement of Questions Involved" on page three of its brief, Erie Business presents five questions, or issues, for our review. Four of those issues focus upon the errors of the ZHB under the requirements of Section 910.2 of the Pennsylvania Municipalities Planning Code,[13] but the second stated

issue, which we will address at the outset, was presented thus:

2. Whether the proposed use of the building by appellee was that of an **apartment, which is a permitted use,** or that of a **homeless shelter, which is not** a permitted use.

Answer: This issue was not answered by the Zoning Hearing Board or by the Court of Common Pleas.

(Erie Business' brief at 3.) (Emphasis added.)

■ Community Services in its Respondent's brief argues that this issue was waived by Erie Business because it failed to preserve the issue before the ZHB and, indicative of that view, points out that in its brief before the common pleas court, Erie Business posed this argument quite differently, *viz.:*

2. The [ZHB] failed to recognize the actual character of the facility proposed by Community Shelter, Inc. to-wit, **a group facility** rather than an apartment and thus, abused its discretion.

(Erie Business' brief to court of common pleas.) (Emphasis added.)

The reason for the change in the statement of the issue presented by Erie Business is

---

**10.** The City of Erie adopted the following resolution:

> [W]hereas the building is proposed to be utilized as a single-room occupancy use, thereby assuring no more than 50 people living within the building at any one time, and whereas it is the Board's opinion that the proposed use will generate a lower number of residents residing at the building in comparison to previous uses, that of the dormitory and motel, and .... whereas the proposed location, although in close proximity with other residential uses, is also in close proximity, and in fact across the street from the C–3 Central Business District and other High Density Residential Developments, including apartment buildings and senior citizen housing, and **whereas the proposed use, that of a 50—unit apartment building is listed as a permitted use in a T–1 District and as such is a conforming use,** now therefore it is the decision of this board that the appellant's request for a variance be and is hereby **approved** conditionally, provided that no more than (1) resident per unit will be allowed, and further provided that a maximum of 32 residents with personal vehicles can utilize the offstreet parking lot, and the remaining residents shall not park a personal vehicle in the imme-

diate neighborhood, and that this be a condition of their lease.
(Resolution of City of Erie, August 7, 1994; R.R. at 91a–92a.) (Emphasis added.)

**11.** On a prior appeal of Wagner and Erie Business Center, the trial court had remanded a decision the ZHB allowing the use because it was unclear as to whether the ZHB actually granted a variance or merely permitted the continuance of a prior preexisting nonconforming use.

**12.** Where, as in the instant matter, the common pleas court has taken no additional evidence, our scope of review is limited to a determination of whether the ZHB abused its discretion, committed an error of law, or made findings of fact which were not supported by substantial evidence. *Pittsburgh Trust for Cultural Resources v. Zoning Board of Adjustment,* 145 Pa.Cmwlth. 503, 604 A.2d 298 (1992), *petition for allowance of appeal denied,* 538 Pa. 618, 645 A.2d 1320 (1994).

**13.** Act of July 31, 1968, P.L. 805, *as amended,* added by Section 89 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2.

patently obvious, and of critical importance,[14] because, a "Group Care Facility" *is an expressly permitted use in the T–1 Transitional Zoning District,*[15] whereas a "homeless shelter" is not even a defined term in the zoning ordinance and, as such, facially would be a totally prohibited use within the City. To further support its challenge on grounds of waiver, Community Services points out that Erie Business argued before the ZHB that the Travel Lodge building was an "apartment" which is also an expressly permitted use in the T–1 district under the term "multiple family dwelling."[16] Therefore, Community Services argues that Erie Business is now precluded from arguing that the motel building will be used as a "shelter" for homeless people, an issue which for the first time is raised on appeal to this Court.

We agree with Community Services that Erie Business has failed to preserve this issue and thus it has been waived. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974); *Morgan v. Sbarbaro*, 307 Pa. Super. Ct. 308, 453 A.2d 598 (1982).

■ Even if this specific issue had been preserved, however, it is, nonetheless, totally meritless. First, a "shelter," homeless or otherwise, is not defined in the zoning ordinance, and Erie Business does not attempt to define "shelter" in its argument before this Court. Rather, Erie Business relies upon an excerpt from the testimony of Kitty Cancilla, the Executive Director of Community Shelter, before the ZHB. In its Statement of the Case, Erie Business states the following as part of the underlying "facts":

> [Community Shelter] applied for, and received, a zoning variance to use the property for a 'temporary, emergency shelter to homeless people.' (See August 9, 1994 testimony of Ms. K. Cancilla, Executive Director of CSS, [R.R. at 17a.] )

(Erie Business' amended brief at 5.)

This quote, an excerpt only, is taken completely out of context and is entirely misleading. First, a use variance was never requested by Community Services. Second, the full testimony of Ms. Cancilla was as follows:

Q. And very briefly, what does Community Shelter Services do?

A. Primary work is to provide temporary, emergency shelter to homeless people. *And [in] more recent years we have taken measures to provide housing for people who struggle with low income and the reality of housing problems.*

Q. And that latter function, where is it performed at?

A. At this point we operate Columbus Apartments, a project at 655 West 16th Street. It is a SRO building, single room occupancy facility. We house men and women.

Q. The proposed use at 202 West 9th—I call it the Travel Lodge building—is that more like an emergency shelter *or* Columbus Apartments?

---

14. *See* Pa. R.A.P. 2116.

15. A "Group Care Facility" is defined in Article 6 of the Zoning Ordinance as:

> An establishment that provides room and board to persons who are residents by virtue of receiving supervised specialized services limited to health, social, rehabilitative or housing services provided by a governmental agency, their licensed or certified agents or other responsible non-profit social service corporation. Supervision shall be provided by at least two responsible adults on duty on the premises on a 24 hour a day basis. The residents of the facility need not be related to each other.

16. We note that the term "apartment" likewise is not a defined term in the Erie Zoning Ordinance. Of course, Erie Business does not challenge the decision of the ZHB on those grounds, acknowledging, as it must, (1) that it, itself, owns several "apartments over on West 8th Street" (N.T. at 58; R.R. at 70a); (2) that the subject property is "surrounded by small multi-family units" (¶ 7, Notice of Appeal to Court of Common Pleas); (3) that "apartments" are a permitted use (Issue No. 2, Statement of Questions Involved, Erie Business' brief at 3); (4) that located in the same block with the Travel Lodge building "are various apartment buildings which are rented by college students and young professionals" (Erie Business' brief at 6); and (5) states that the common pleas court and ZHB erred when they considered this "homeless shelter" an "apartment building" (Erie Business' brief at 20). What is obvious is that both parties, as well as the ZHB and the common pleas court, **all** have used the two terms "multi-family dwelling" and "apartment building" interchangeably, meaning the identical thing.

A. *Most definitely like Columbus Apartments.*

Q. And does Community Shelter Services have a contract to purchase the Travel Lodge building?

A. We do, yes.

Q. At Columbus, can you tell us the average length of stay?

A. Average length of stay is six [to] nine months.

(N.T. at 4–5; R.R. at 16a–17a.) (Emphasis added.)

When Ms. Cancilla's complete testimony is considered, it is obvious that she did not say, or even imply, that the subject property would be used as an emergency shelter to shelter homeless people; *she testified directly to the contrary,* that the Travel Lodge facility would *not* be like an emergency shelter but would be like its other facility, Columbus Apartments. Moreover, contrary to the assertion of Erie Business that the common pleas court did not answer the second issue, it really **was** answered by Judge Michael T. Joyce of the Court of Common Pleas of Erie County, who perceptively recognized the real significance of the question as presented by Erie Business. We quote with approval from the opinion of Judge Joyce:

> Clearly, the interview process and the rules residents would have to follow are much more demanding than those of most apartments and contradicts the Appellants' outrageous claim that 50 hardened, drug addicted and mentally unstable people would be introduced to the neighborhood. (See p. 13 of [Erie Business' brief.] )[ [17] ]
>
> **In addition [Erie Business is] really contesting the economic status of the potential residents.** Mary Kolbe, the [Erie Business'] Director of Student Services, testified that she would have no problem with the building being rented to 50 college students. (Transcript August 9, 1994 at p. 61). Tony Petrello, the Acting Director of Admissions and Personnel, also testified he had no objection to the building being rented to 50 college students. (Transcript at pp. 65–66). Even Richard Wagner testified that he would not contest the building being used for college students and that low income housing had no place in the neighborhood. (Transcript at pp. 54–56). Hence, the Appellants are more concerned about the economic status of the residents instead of with the effect a parking variance will have on the neighborhood. **The residents' economic status is not a proper basis for refusing a variance, especially since the variance was not requested for that reason.**

(Common Pleas Court opinion at 9–10.) (Emphasis added.)

Second, because a "homeless shelter," as a type of living arrangement, is not a defined term in the zoning ordinance, the argument of Erie Business that "it is not the responsibility of the Board to twist, torture, and expand common usages to allow it," is curious because *if* this type of living arrangement was not a permitted use *anywhere in the city,* such as a "Group Care Facility," it could be the subject of an exclusionary challenge by a property owner. *See Fernley v. Board of Supervisors of Schuylkill Township,* 509 Pa. 413, 502 A.2d 585 (1985) (a township zoning ordinance which absolutely prohibits apartment buildings is constitutionally infirm).[18]

---

17. Erie Business, in its amended brief to this Court at pages 19–20, argues:

> Ms. Cancilla's testimony is indicative of the true character of the facility—— that it is not simply a 50–Unit apartment complex. It is more aptly described as an establishment which provides shelter to persons, including persons on probation, persons with alcohol or drug problems, and/or people with mental problems (page A34–A35). These persons live under strict supervision of the staff in a communal-like environment.
>
> By *designating the proposed homeless shelter* an 'apartment building,' and granting the variance, the Board exceeded its mandate and the trial court abused its discretion. This is simply NOT an apartment building. It is too great a stretch of the imagination to call this shelter an apartment building. **When an ordinance does not contain a proposed usage, it is not the responsibility of the Board to twist, torture, and expand common usages to allow it.**

(Erie Business amended brief at 19–20.) (Emphasis added.)

18. Similarly, if "apartments" were not deemed to be a permitted use under the term "multiple family dwelling" (which no one is asserting) that separate type of living arrangement could not be

Furthermore, by common understanding, a homeless shelter would be a facility that would most likely provide regular meals to the residents (which Community Services does not provide) and as such it too would be a permitted use as a "group care facility" in the T–1 Transitional Use Zoning District. In *Repko v. Zoning Hearing Board of the City of Greensburg*, 102 Pa.Cmwlth. 272, 517 A.2d 1028 (1986), we held that a proposed shelter, which would provide temporary housing and counseling to abused women and children, was a rooming house. Similarly, in *Martin v. Zoning Hearing Board*, 157 Pa.Cmwlth. 32, 628 A.2d 1214 (1993), we held that a facility for women completing drug rehabilitation treatment was a "Boarding and Rooming House" within the meaning of the borough's zoning code. All of these uses, *viz.* "group care facility," "rooming homes" and "boarding homes," *are expressly permitted uses in Erie's T–1 Transitional Use Zoning District.*

Thus, it is clear that Erie Business failed to convince either the ZHB or Judge Joyce that the property would in fact be used as a shelter for homeless people who were "chronic drug and alcohol abusers," "people on probation" and "people with mental health problems." The facts as found by the ZHB are very much to the contrary; even *IF* that type of population were to inhabit the building, they could reside in a "group care facility," "a group residence facility," a "rooming or boarding home," or a "tourist home," all of which are types of living arrangements defined in the zoning ordinance and *expressly permitted* in a T–1 Transitional Use Zoning District.[19] The sole argument which Erie Business raises in this regard is that this "type" of resident should not be permitted to reside in this neighborhood, an argument which, as Judge Joyce cogently points out, has never been a proper basis for refusing a variance.

■ Erie Business next contends that Community shelter has failed to justify a grant of a variance because it has not established that an unnecessary hardship exists because:

• it has failed to establish that the property would be rendered useless absent the grant of the variance;

• any hardship was self-created in that Community Shelter has only an option to purchase the building that it could choose to exercise; and,

• the proposed use of the property would be detrimental to the safety and welfare of the area and would alter the essential character of the neighborhood.

■ A variance requires that the property owner show that there are unnecessary hardships unique to the land that prevent development of the land in accordance with zoning restrictions, and that the proposed variance will not be adverse to the health, welfare and safety of the community. *Carman v. Zoning Board of Adjustment*, 162 Pa.Cmwlth. 80, 638 A.2d 365 (1994), *petition for allowance of appeal granted*, 540 Pa. 622, 657 A.2d 492, and *appeal dismissed as having been improvidently granted*, 542 Pa. 363, 667 A.2d 214 (1995); Section 910.2 of the Pennsylvania Municipalities Planning Code.[20]

excluded from a municipality. "Because the township has failed to establish that the total exclusion of apartments serves a legitimate public purpose, the zoning ordinance is unconstitutional insofar as it fails to provide for apartments or for other types of multi-family housing." *Fernley*, 509 Pa. at 420, 502 A.2d at 588.

19. They might even live in a "nursing/convalescent home" which is also an expressly permitted use, although an undefined term, in the T–1 District. *See supra* note 6.

20. Section 910.2 of the Pennsylvania Municipalities Planning Code has established that the ZHB may grant a variance due to unnecessary hardship when *all* of the following findings have been made:

(1) that there are unique physical circumstances or conditions including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property, and that the unnecessary hardship is due to such conditions and not the circumstances or conditions created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located; (2) that because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance, and that the authorization of a variance is therefore necessary to enable the reasonable use of the property; (3) that such unnecessary hardship has not been created by the appellant; (4) that

In order to establish that an unnecessary hardship exists, Community Services must prove· that either (1) the physical characteristics of the property are such that it could not be used in any case for any purpose permitted in that zoning district or that it could only be used for a permitted purpose only at prohibitive expense, or (2) the characteristics of the property are such that the lot has either no value or only distress value for any purpose permitted by the zoning ordinance. *Laurento v. Zoning Hearing Board,* 162 Pa.Cmwlth. 226, 638 A.2d 437 (1994); *see also Isaacs v. Wilkes–Barre City Zoning Hearing Board,* 148 Pa.Cmwlth. 578, 612 A.2d 559 (1992).

Although unnecessary hardship usually relates to the physical characteristics of the land, at times, the unnecessary hardship can relate to the building itself. Where the use of property for any purpose is possible only through extensive reconstruction or demolition of the building, it has been held sufficient to establish an unnecessary hardship. *Logan Square Neighborhood Association v. Zoning Board of Adjustment,* 32 Pa. Cmwlth. 277, 379 A.2d 632 (1977). In a case similar to the facts in the instant case, *Davis v. Zoning Board of Adjustment,* 78 Pa. Cmwlth. 645, 468 A.2d 1183 (1983), we upheld the grant of a variance from the lot area requirements to allow a property owner to rehabilitate and use an abandoned and vacant four-story apartment building located in a residential zone as a seventeen-unit multi-family dwelling. We held that because the premises could not conform with the zoning restrictions absent demolition and reconstruction, an unnecessary hardship existed. *Id; see also Zoning Hearing Board of the Township of Indiana v. Weitzel,* 77 Pa. Cmwlth. 108, 465 A.2d 105 (1983) (holding that where the only options available to a property owner without a use variance were to either convert his three-story school building into a single-family dwelling or demolish the building and subdivide the lot, more than

"mere economic hardship" existed and evidence of unnecessary hardship was established).

Succinctly stated, the legal principles we apply in this case are the same as those examined and applied in *Price v. Zoning Board of Adjustment,* 44 Pa.Cmwlth. 95, 403 A.2d 196 (1979), where the building, a three family dwelling, was a permitted use which did not meet the minimum yard requirements and the owner applied for a dimensional variance. The property had been abandoned for approximately ten years, during which time the tract had been subdivided into dimensional noncompliance; thus, the need for a variance. In affirming the zoning board and the trial court, and granting the dimensional variance, we stated:

> It is undisputed here that the building could not reasonably be moved, nor could the lot dimensions be expanded. And even the appellant concedes that without a variance the property would be practically valueless. We believe, therefore, that this is sufficient evidence of hardship.

*Id.*, 403 A.2d at 197.

Accordingly, we affirm the judgment of the Court of Common Pleas of Erie County and the grant of the two dimensional variances to Community Services.

### *ORDER*

NOW, May 2, 1996, the order of the Court of Common Pleas of Erie County in the above-captioned matter, granting the two dimensional variances to Community Shelter Services, Inc., is hereby affirmed.

FRIEDMAN, J., concurs in the result only.

PELLEGRINI, Judge, dissenting.

I respectfully dissent because Community Shelter Services Inc. failed to establish their need for a variance because they neither established that they could not use the prop-

---

the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use of development of adjacent property, not be detrimental to the public welfare; (5)

that the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

53 P.S. § 10910.2.

erty in accordance with the zoning ordinance nor that it was the minimal variance needed to make the building useful.

Community Shelter Services, Inc., a private, non-profit corporation, has an option to purchase property located at 202 West 9th Street in Erie, Pennsylvania, as a facility for low-income and homeless persons.[1] To house those individuals, it desires to convert the building on the property previously used as a college dormitory, although built as a motel, to a 50-unit single-room occupancy apartment. The property is located in a T-1 "Transitional Use" zoning district. Because in a T-1 zoning district each dwelling unit must have at least 1,500 square feet of lot area or a total of 75,000 square feet, and one parking space per unit or 50 spaces, Community Shelter sought a variance from the Board from the City of Erie Zoning Ordinance (Zoning Ordinance)[2] lot area and parking requirements. This variance was contested by neighboring property owners Richard Wagner and Erie Business Center.

Because of the cost of renovating the building for a 15-unit apartment, the Board approved the variance but with the conditions that only one resident be permitted per unit and that a maximum of 32 residents be permitted to utilize off-street parking. Based on that testimony, both the trial court and the majority hold that Community Shelter has established the right to a variance to have 50 "apartments" when the ordinance only provides that "15 units" are permitted under the ordinance.

A variance requires that the property owner show that there are unnecessary hardships unique to the land that prevent development of the land in accordance with zoning restrictions, and that the proposed variance will not be adverse to the health, welfare and safety of the community. *Carman v. Zoning Board of Adjustment of the City of Philadelphia*, 162 Pa.Cmwlth. 80, 638 A.2d 365 (1994); Section 910.2 of the Pennsylvania Municipalities Planning Code.[3] In order to establish

---

1. Erie Business Center contends that Community Shelter's drug and alcohol policy would result in residents being turned away from the shelter and would pose a threat to the neighboring community. In response, the majority seems to suggest that you can never consider who is going to occupy the premises in determining if a variance is to be granted and, as a general principle, I agree. However, when you do not have tenants selecting where they are going to live that occurs when a "normal" apartment building is "rented up" but instead by an owner who rents only to one group as a social service provider, I believe that difference can be taken into consideration when granting a variance. For example, if an owner applied for a similar variance for a similar sized facility limited to recently released child molesters next door to an elementary school, unlike the majority, I would hold that could reasonably be taken into consideration on whether to grant a similar variance as being detrimental to the health, welfare and safety of the community.

Here, Community Shelter's acknowledged that many prospective residents may be drug and/or alcohol dependent persons, criminals on probation, or mentally-ill persons, but the evidence shows that the shelter would maintain 24-hour supervisory personnel, has rigorous screening procedures, rules and regulations, and residents who violate Community Shelter's policy of leading a drug and alcohol-free life would be evicted from the shelter. Based on those facts, the Board did not abuse its discretion in finding that the proposed use would not be detrimental to the health, welfare and safety of the community.

2. Erie, Pennsylvania Zoning Ordinance No. 40–1968 (1994).

3. Section 910.2 of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, added by Section 89 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2, has established that the Board may grant a variance due to unnecessary hardship when *all* of the following findings have been made: (1) that there are unique physical circumstances or conditions including irregularity, narrowness or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property, and that the unnecessary hardship is due to such conditions and not the circumstances or conditions created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located; (2) that because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance, and that the authorization of a variance is therefore necessary to enable the reasonable use of the property; (3) that such unnecessary hardship has not been created by the appellant; (4) that the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use of development of adjacent property, nor be detrimental to the public welfare; (5) that the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification

that an unnecessary hardship exists, Community Shelter must prove that either (1) the physical characteristics of the property are such that it could not be used in any case for any purpose permitted in that zoning district or that it could only be used for a permitted purpose only at prohibitive expense, or (2) the characteristics of the property are such that the lot has either no value or only distress value for any purpose permitted by the zoning ordinance. *Laurento v. Zoning Hearing Board,* 162 Pa.Cmwlth. 226, 638 A.2d 437, 439 (1994). *See also Isaacs v. Wilkes–Barre City Zoning Hearing Board,* 148 Pa.Cmwlth. 578, 612 A.2d 559, 560 (1992). I would disagree that Community Shelter met either of those requirements because it has not shown that the property cannot be used in accordance with the ordinance nor that the variance granted was the minimum one needed.

While Community Shelter has advanced a case for a "50–unit apartment building", its request for a variance is not based upon that use. A multiple-family dwelling is defined by the Ordinance as "a building or portion thereof, designed for or occupied by three (3) or more families living independently of each other." A dwelling is defined as "any building or portion thereof which is designed for or used for residential purposes. The word 'dwelling' shall not include hotels, motels or other structures used for transient residence." A family includes "a single person occupying a dwelling unit and maintaining a household."[4] The use of 50 single rooms, each with a bed, bathroom and microwave, with attendant supervisory services and common kitchens, is not a 50–unit apartment with 50 separate households but something else. The trial court expressed a similar view when it stated in its opinion that "the building and property can only be used for a

family dwelling at a prohibitive expense.... However, this is irrelevant in light of the fact that 50 units are not going to be rented to families, but rather, one resident per room for which the building is already in compliance with."[5]

Because the proposed use as the trial court found is not for a 50–unit apartment, it is axiomatic that Community Shelter has failed to establish that it needs a variance to be able to use the property for that use. At the core of any analysis on whether to grant a variance is the requested use because the use determines the type and need for a variance. Even though we suspect that any needed variance will either be the same as the one requested or one that is less than the one presently before us, and Community Shelter has presented a strong case for the use it intends to occupy the building, it has not presented a case for the use it applied for— that of a 50–unit apartment.

Even if the use is for 50 apartment units, I disagree that they have established a right to have a density of use that is over 200% more than the Zoning Ordinance allows. As the majority points out, although unnecessary hardship usually relates to physical characteristics of the land, at times, the unnecessary hardship can relate to the building itself, where the use of property for any purpose is possible only through extensive reconstruction or demolition of the building, it has been held sufficient to establish an unnecessary hardship. However, just because the building cannot be used for its original intended use does not give the owner the right to get the maximum use out of the property, but only the use necessary that it not be rendered valueless.

Section 912(5) of the Pennsylvania Municipalities Planning Code (MPC), 53 P.S.

possible of the regulation at issue. 53 P.S. § 10910.2.

4. Erie, Pennsylvania Zoning Ordinance No. 40–1968, Article 6 (1994).

5. The use appears to fall within the definition of a "rooming/boarding home" which is defined as "a building or part thereof, other than a hotel or restaurant where meals and/or lodging are provided, for compensation for three or more persons not transients." Zoning Ordinance, Article 6 (1994). While a rooming/boarding home is permitted in a T–1 zone and the parking requirement is the same, we are unable to determine from the Zoning Ordinance with any certainty what the lot area requirements are for this type of establishment. It would appear from the definition, however, that something less than the lot area for a dwelling unit is required because a room for sleeping is not a dwelling unit.

§ 10912(5), requires the Board to make a finding:

That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue. Code § 912(5), 53 P.S. § 10912(5).

While Community Shelter established that the cost of bringing the building in compliance with safety codes and renovation costs would be exorbitant to convert it to a 15 unit apartment, the Board made no finding as required by the MPC that was the minimum variance necessary to productively use the property. Accordingly, I would also reverse for that reason.

McGINLEY and KELLEY, JJ., join in this dissent.