# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Demko, an individual, and : 
Stephen Pascal, an individual :
 :
          v. : No. 646 C.D. 2016
 : ARGUED: November 15, 2016
City of Pittsburgh Zoning Board of :
Adjustment, and Trek Development :
Group, Inc. :
 :
          v. :
 :
The Urban Redevelopment Authority :
of Pittsburgh, and City of Pittsburgh :
 :
Appeal of: Trek Development Group, :
Inc., The Urban Redevelopment :
Authority of Pittsburgh and the City :
of Pittsburgh :

BEFORE:   HONORABLE ANNE E. COVEY, Judge
              HONORABLE JULIA K. HEARTHWAY, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge

OPINION BY
JUDGE HEARTHWAY           FILED: March 7, 2017

       Trek Development Group, Inc. (Trek), The Urban Redevelopment Authority of Pittsburgh (URA), and the City of Pittsburgh (City) (collectively, Appellants)[1] appeal from the March 23, 2016, order of the Court of Common Pleas of Allegheny County (Trial Court), which reversed the decision of the City's

---

[1] By letter dated June 28, 2016, the City's Zoning Board of Adjustment (Board) informed this Court that it agreed with the positions and arguments of URA, City, and Trek as stated in their respective briefs, and that the Board would not be filing a brief.

Zoning Board of Adjustment (Board) granting Trek's variances and special exception. In particular, Trek's variance application sought to vary (i) the floor area ratio requirement from 2:1 to 4.8:1 and (ii) the height requirement from 45 feet / 3 stories to 97 feet / 8 stories (collectively, Variances) in order to develop a deteriorating property that has been vacant for a number of years. Trek's special exception request sought to provide offsite parking for the proposed structure (Special Exception). We affirm.

The subject property consists of several parcels located at the corner of West North Avenue and Federal Street in the Central Northside Neighborhood of the City. The parcels are identified as 2, 4, 6 and 8 West North Avenue (West North Avenue Properties) and 1131, 1133 and 1135 Federal Street (Federal Street Properties) (collectively, Property). The Property is located in a Local Neighborhood Commercial (LNC) District in the City.[2] (Board's Findings of Fact (F.F.) No. 1.)

The West North Avenue Properties are part of what has been known as the "Garden Theater Block." The West North Avenue Properties contain three buildings that have been unoccupied for a number of years and are in deteriorating

---

[2] The purpose of the LNC District is to:
> 1. Maintain the small scale and rich diversity of neighborhood-serving commercial districts;
> 2. Promote and enhance the quality of life in adjacent residential areas; and
> 3. Reduce the adverse impacts that are sometimes associated with commercial uses in order to promote compatibility with residential development.

Zoning Code of the City of Pittsburgh, Pennsylvania (Zoning Code), § 904.02.A.

condition. The façades of the three structures on the West North Avenue Properties remain generally intact, with heights of 67 ft., 38 ft., and 50 ft., and are part of the area's history and character. The Federal Street Properties contain two, two-story brick structures in deteriorating condition. (F.F. Nos. 2-3, 6.)

URA owns the Property. URA initiated redevelopment of the Property by issuing a request for proposal (RFP) in 2007, and again in 2011 and 2014. Each RFP included the requirement that the existing buildings on the West North Avenue Properties (Existing Buildings) be preserved, rehabilitated and incorporated into the proposed development project.[3] Proposed projects were selected from the 2007 and 2011 RFPs but final development was not accomplished. Thus, URA issued the 2014 RFP, from which URA selected Trek's proposal. (F.F. Nos. 4, 7-8.)

Trek proposes to preserve and rehabilitate the Existing Buildings and to incorporate them into an 8-story, 97-foot mixed-use building, that would occupy both the West North Avenue Properties and the Federal Street Properties. The new building would consist of retail uses on the ground floor, and up to 72 residential units on the upper stories (Project). (F.F. Nos. 9-10.)

---

[3] The RFP was not admitted into evidence. Despite the phrasing of the Board's finding, (F.F. No. 7), it appears that the requirement may only be to preserve the front façades of the buildings on the West North Avenue Properties, rather than the entirety of the buildings. (*See* R.R. at 189a.) This discrepancy is immaterial to our decision. We will refer to the requirement simply as applying to the Existing Buildings.

3

In order to develop the Property as proposed, Trek needs the Variances and Special Exception. On August 6, 2015, the Board held a hearing on Trek's application for the Variances and Special Exception.

At the hearing, Trek presented the testimony of Kyra Straussman (Straussman), URA's Director. She described the process of URA's acquisition of the Property and the prior RFP processes, all of which included retaining the Existing Buildings. (F.F. No. 23; R.R. at 79a-80a, 83a-84a.) She explained that the Existing Buildings are in poor condition. (R.R. at 80a-81a.) She stated that it was URA's policy to try to preserve the Existing Buildings, and that if a future RFP was necessary, it would also require that the Existing Buildings be preserved. (F.F. No. 23; R.R. at 79a-80a; *see* R.R. at 84a-85a.)

Trek also presented the testimony of William Gatti (Gatti), Trek's founder and President. (R.R. at 94a.) Gatti testified concerning three development options Trek considered based on URA's requirement that the existing buildings be maintained: (i) renovation of the Existing Buildings; (ii) incorporation of new buildings along with the Existing Buildings in compliance with the dimensional requirements of the Zoning Code of the City of Pittsburgh, Pennsylvania (Zoning Code); and (iii) the proposed Project. (F.F. No. 26, R.R. at 94a-103a, 204a.) Gatti explained that for the development to be financially viable, Trek would need to produce enough rental units to support the cost, and that only the third option, *i.e.*,

4

the Project, which requires the Variances at issue, was viable.[4] (*See* F.F. Nos. 15, 26-27; R.R. at 98a-99a, 103a.)

Trek also presented the testimony of Dirk Taylor (Taylor), a structural engineer who assessed the structural condition of the Existing Buildings. (F.F. No. 24.) Taylor testified that the Existing Buildings would require significant and costly structural work to meet building code requirements. (F.F. No. 24.) Taylor testified that incorporating the Existing Buildings substantially increases the cost of the Project. (R.R. at 93a.) Indeed, when questioned about the difference in cost between building on the vacant site versus building on the site where these structures are in place, Taylor estimated that the restoration project would at least double the cost. (R.R. at 92a-93a; *see* F.F. No. 24.) Additionally, when asked what his recommendation would be for these buildings in a typical situation absent URA's requirement, Taylor stated it would be far less expensive to demolish them to rebuild similar construction. (R.R. at 91a.)

Trek also presented the testimony of Ken Doyno, the architect for the Project. He stated it would not be possible to build the same number of units on

---

[4] The Board found that the cost of incorporating the existing structures into the redevelopment of the site would be approximately $1.5 to $2.7 million. (F.F. No. 14.) However, we note that Gatti did not use the term "cost;" rather, he repeatedly testified concerning the "premium" associated with each of the three development options. For example, Gatti stated that there are different "premium" numbers for the three options "ranging from 1.5 to 2.5 million dollars for restored – restoring the buildings and renovations" (R.R. at 99a), and that Trek "would like to see a 2.4 million premium that we have itemized associated with stabilizing this current structures [sic]" (R.R. at 96a). He also stated the "proposal is the bare minimum margins …." (R.R. at 102a.)

5

the Property in a smaller building or one with a lower floor area ratio. (F.F. No. 29.)

There was testimony from area residents and community groups both in support of and in opposition to the Project. (F.F. Nos. 31-37.) Councilwoman Darlene Harris testified in opposition to the Project. (F.F. No. 35.)

On October 8, 2015, the Board issued its decision granting Trek's Variances and Special Exception. In its decision, the Board concluded that the historic Existing Buildings constitute a unique condition of the Property and that they should be preserved, and that the unique circumstances result in an unnecessary hardship justifying the requested dimensional Variances. (Board's Conclusions of Law (C.L.) No. 8.) The Board further concluded the Variances would allow for additional residential units and that those units are intended to provide sufficient revenue to justify the development costs and are not merely for the highest financial gain. (C.L. No. 7.) The Board also concluded that any detrimental impact from the additional height and floor area ratio is outweighed by the benefits anticipated from the redevelopment of the Property. (C.L. No. 9.)

David Demko (Demko) and Stephen Pascal (Pascal)[5] filed separate appeals from the Board's decision with the Trial Court, and the Trial Court consolidated those appeals.[6] (R.R. at 57a.) The Trial Court, without taking any

_____

[5] Demko resides one block from the Property and is the Assistant Director of Scenic Pittsburgh. (R.R. at 229a-30a.) Pascal owns real property located less than 500 feet away from the Property. (R.R. at 20a, ¶ 3; R.R. at 22a, ¶ 22.)

[6] Trek, URA, and the City intervened in the matter. (R.R. at 1a.)

additional evidence, reversed the Board's decision with respect to both the Variances and the Special Exception.

Concerning the Variances, the Trial Court ruled that Trek failed to prove that there are unique physical circumstances on the Property which cause unnecessary hardship because Trek's reasons for the unique physical circumstances mainly concern financial hardship. The Trial Court pointed to Gatti's testimony that, for the Project to be financially viable, Trek would need to produce enough rental units to support the cost of the Project. The Trial Court also concluded that the requirement to maintain the façades was a self-imposed condition created by URA. (Trial Court opinion at 5.) The Trial Court stated that if the buildings were demolished, the Property could easily be developed in conformity with the Zoning Code. The Trial Court also concluded that the Variances are not the least modification necessary to develop the Property.

Appellants now appeal to this Court from the Trial Court's order.[7] Before this Court, Appellants argue that: (i) the Trial Court disregarded the substantial evidence supporting the Board's findings and impermissibly substituted its own findings; (ii) the Board properly considered the Existing Buildings to be a unique condition of the Property and that the preservation of the Existing Buildings warrants the grant of the dimensional Variances; and (iii) the Board properly

_____

[7] Where, as here, the trial court does not take additional evidence, the board's decision must be upheld unless the board committed an error of law or "a manifest abuse of discretion." *Valley View Civic Association v. Zoning Board of Adjustment*, 462 A.2d 637, 639 (Pa. 1983). A zoning board abuses its discretion "only if its findings are not supported by substantial evidence." *Id*. at 640.

7

granted the Special Exception. In particular, Appellants argue that the Board's finding that preservation of the Existing Buildings creates an unnecessary hardship is supported by substantial evidence. They maintain that the Trial Court erred as a matter of law in considering the factors for a dimensional variance, particularly where URA claims it was following its statutory mandate to preserve the existing buildings. They argue the Board's findings must be afforded deference, particularly with respect to a finding of hardship, given the Board's expertise in and knowledge of local conditions. They maintain that the Property cannot be developed in an economically viable way that also conforms to the Zoning Code. In support of this argument, they point to the fact that others have tried and failed to develop the Property.

In response, Appellee Pascal[8] argues that Trek failed to meet each of the requirements for a dimensional variance, and that the Trial Court correctly determined that the Board erred in granting the Special Exception. We agree with Pascal that Trek did not meet its burden to establish entitlement to the Variances, and because of our disposition, we need not address any arguments related to the Special Exception.

At the outset, we note that Appellants arguments are misleading. Appellants maintain that the Property cannot be developed in an economically viable way that also conforms to the Zoning Code. However, that is not what is

---

[8] By order dated August 24, 2016, this Court precluded Appellee Demko from filing a brief and participating in oral argument due to Demko's failure to file a brief pursuant to this Court's order dated August 1, 2016.

happening here. Appellants are not attempting to develop the Property in conformity with the Zoning Code, nor are Appellants attempting to merely maintain the existing non-conformity while preserving the Existing Buildings. Instead, in an effort to keep the Existing Buildings, Appellants are seeking to increase the non-conformity for economic viability.

Under section 922.09.E of the Zoning Code, an applicant for a variance bears the burden of establishing *all* of the following: (1) that there are unique physical circumstances or conditions peculiar to the property, and that the unnecessary hardship is due to those conditions; (2) that because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the Zoning Code; (3) that such unnecessary hardship has not been created by the appellee/applicant; (4) that the variance will not alter the essential character of the neighborhood nor be detrimental to the public welfare; and (5) that the variance represents the minimum variance that will afford relief and will represent the least modification possible of the regulation at issue. Zoning Code § 922.09.E.

Where, as here, we are faced with a dimensional variance, our Supreme Court has articulated a more relaxed standard for granting a variance. Under this relaxed standard, when addressing the element of unnecessary hardship, "courts may consider multiple factors, including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood." *Hertzberg v. Zoning*

9

*Board of Adjustment of City of Pittsburgh*, 721 A.2d 43, 50 (Pa. 1998). Although *Hertzberg* eased the requirements for a variance, it did not remove them. *Tidd v. Lower Saucon Township Zoning Hearing Board*, 118 A.3d 1 (Pa. Cmwlth. 2015). Moreover, despite a more relaxed standard, it is still the case that "[t]he burden on an applicant seeking a variance is a heavy one, and the reasons for granting the variance must be substantial, serious and compelling." *Singer v. Philadelphia Zoning Board of Adjustment*, 29 A.3d 144, 149 (Pa. Cmwlth. 2011).

Initially, we acknowledge some precepts concerning hardship which, importantly, are in the context of compliance with the relevant zoning regulations and non-conforming structures. We recognize our courts "have never required demolition of a legally non-conforming structure to afford the opportunity to bring the property into compliance with the relevant zoning code."[9] *Marshall v. City of Philadelphia*, 97 A.3d 323, 332 (Pa. 2014). Similarly, the "Board's discretion is not so circumscribed as to require a property owner to reconstruct a building to a conforming use regardless of the financial burden ...." *O'Neill v. Philadelphia Zoning Board of Adjustment*, 120 A.2d 901, 904 (Pa. 1956). Moreover, while "unnecessary hardship usually relates to the physical characteristics of the land, at times, the unnecessary hardship can relate to the building itself." *Wagner v. City of Erie Zoning Hearing Board*, 675 A.2d 791, 799 (Pa. Cmwlth. 1996); *see also Hertzberg*, 721 A.2d at 49 (*quoting Wagner*). This Court has held that where demolition and reconstruction were required in order to conform to the zoning

---

[9] Thus, the Trial Court's statement that if the buildings were demolished, the Property could easily be developed in conformity with the Zoning Code is not dispositive and was in error. Nevertheless, this does not require a reversal, as we may affirm the Trial Court's decision on other grounds.

10

restrictions, an unnecessary hardship existed. *Wagner* (discussing holding in *Davis v. Zoning Board of Adjustment*, 468 A.2d 1183 (Pa. Cmwlth. 1983)). These precepts are inapposite here, however, because Appellants are not attempting to develop the Property in conformity with the Zoning Code, nor are Appellants attempting to merely maintain the existing non-conformity.

Relying on *Hertzberg* and *Marshall*, Appellants nonetheless argue that the Existing Buildings, which they are required to preserve by URA, constitute a unique condition resulting in a hardship. Further, relying on *Tidd*, Appellants argue that "unique conditions" can include an evaluation of existing property conditions. In *Hertzberg*, the applicant sought to convert an existing four-story vacant building into office space and a lodging house. *Hertzberg*. The Court set forth the multiple factors, outlined above, that may be considered to justify the grant of a dimensional variance, stating that to hold otherwise "would prohibit the rehabilitation of neighborhoods by precluding an applicant who wishes to renovate a building in a blighted area from obtaining the necessary variances." *Id* at 50. In *Marshall*, the applicant applied for use and dimensional variances to convert a century-old school into an apartment complex for low income senior citizens. The applicant's unnecessary hardship argument was based on its assertion that the property could be conformed for a permitted use only at prohibitive expense. *Id*. In *Tidd*, this Court upheld the grant of a dimensional variance where, without it,

11

the applicant would have been required to remove a line of trees on the property at a prohibitive cost in order to comply with the zoning requirement.[10]

In essence, Appellants argue that they are entitled to the Variances, because, like the applicant in *Hertzberg*, they seek a permitted use in a blighted or dilapidated urban area and they seek to renovate a vacant property for productive use. We disagree, however, that these factual similarities compel the same result.

Importantly, *Hertzberg*, *Marshall* and *Tidd* considered the financial burden to the applicant if the variances were not granted and the applicant had to bring the property *into compliance with the zoning code* in order to use it. Here, there were no findings or conclusions by the Board, nor was there any evidence presented, concerning the cost to the applicant to bring the property *into compliance with the Zoning Code*.[11] Rather, the Board's findings and conclusions, as well as the evidence, concerned Trek's cost to "comply with the property owner's strictures." (*See* C.L. No. 8.) The property owner's strictures are self-imposed conditions, and are not a hardship created by the Zoning Code. Indeed, there was no evidence presented to establish, nor does our review of the Zoning Code reveal, that the LNC District contains any restrictions concerning historical or architectural protections which would require that the Existing Buildings be

_____

[10] In *Tidd*, there was also an extensive utility easement on the property which restricted its use. Additionally, the local governing body had imposed a condition on the applicant concerning the tree removal.

[11] Although Taylor testified that the buildings would require significant and costly structural work to meet building code requirements, (F.F. No. 24), that is not the same as the Zoning Code. Additionally, although one of the options Gatti presented complied with the Zoning Code, it was based on complying with URA's requirements.

12

maintained, as URA requires. Because *Hertzberg*, *Marshall* and *Tidd*, as well as prior precedent, did not involve a hardship resulting from complying with a property owner's requirements, those cases are neither binding nor instructive here.[12] Where a hardship is self-imposed, a variance cannot be granted. *See* Zoning Code § 922.09.E(3). A property owner simply cannot impose a requirement concerning the condition of his property and then claim that the hardship is due to the self-imposed condition.

Appellants do not dispute that URA has imposed this condition. Nonetheless, Appellants argue that it is not self-imposed and the buildings should be considered a unique condition of the Property, because URA maintains it was complying with its enabling statute which requires it to conserve blighted areas.[13] Pascal, on the other hand, argues that Trek simply made bald assertions that the goal of the Project is historic preservation when, in reality, URA's goal for the urban renewal zone in which the Property is located is the removal of blight.

Importantly, Straussman, URA's Director, did not offer any testimony to support Appellants' argument that the reason for preserving the Existing Buildings was based on URA's enabling statute, the Urban Redevelopment Law

---

[12] Moreover, in *Hertzberg* and *Marshall*, the applicants sought to convert existing buildings without the need to increase the height and mass of the existing buildings, unlike the matter before us.

[13] The URA is a Commonwealth authority created pursuant to the Urban Redevelopment Law (URL), Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §§ 1701-1719.2. *See* sections 4 & 9 of the URL, 35 P.S. §§ 1704, 1709. As such, it is an agent of the Commonwealth. *See* 35 P.S. § 1709; *Herriman v. Carducci*, 380 A.2d 761 (Pa. 1977).

13

(URL),[14] or any other statutory mandate. In fact, Straussman never discussed the URL. Similarly, although Straussman testified generally concerning URA's redevelopment efforts in the area, Straussman testified only that it is URA's policy to try to preserve the Existing Buildings. (R.R. at 79a-80a.) There is nothing in her testimony, or in the other evidence or the Board's findings, that would lead one to conclude that there is any legal authority requiring these buildings to be preserved.[15] Even assuming such authority existed, it was applicant's burden to present it.[16] *See Singer*.

Moreover, even if we take judicial notice of the URL, it does not compel the conclusion that URA is required to preserve these buildings. Under the URL, URA exists and operates for the public purpose of the "elimination of blighted areas through economically and socially sound redevelopment of such areas …." Section 2 of the URL, 35 P.S. § 1702. Although the URL recognizes that certain blighted areas may be subject to rehabilitation or conservation, the URL also recognizes that certain areas may require total clearance if the prevailing

---

[14] Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §§ 1701-1719.2.

[15] For example, although Appellants characterize the buildings as "historic" and rely on section 102(3) of the History Code, 37 Pa. C.S. § 102(3), for the proposition that Pennsylvania values historical and architectural heritage, there was no evidence presented that any of the existing buildings are on the Pennsylvania Register of Historic Places or the National Register of Historic Places.

[16] In their brief, URA and the City cite extensively to *In re Condemnation by Urban Redevelopment Authority*, 913 A.2d 178 (Pa. 2006), with respect to the factual background and URA's role in the redevelopment of the Garden Theater Block. That case involved a different piece of property, different legal issues and different parties. Therefore, to the extent the same evidence was not presented in the case before us, we may not consider it, and factual findings from that case are not binding here.

14

condition of decay makes it impracticable for rehabilitation or conservation. Section 2 of the URL, 35 P.S. § 1702(c.1).

Nevertheless, Appellants state that the Board properly respected URA's approach, finding that the Existing Buildings are part of the unique and historic character of the area and therefore should be preserved. They contend the Board's determination is owed deference because of the Board's expertise in and knowledge of local conditions. Appellants also argue that substantial evidence supports a finding that the hardship is not self-imposed because the Existing Buildings are part of an eclectic mix, URA spent considerable money preserving the Existing Buildings, community members support the project, and two other parties have attempted but failed to preserve the Existing Buildings. Appellants argue that the Trial Court did not address the Board's findings with regard to the history of the Property or the deference to be accorded to the Board.

We acknowledge "a zoning board's findings are owed deference, particularly its determination that a variance applicant satisfied the unnecessary hardship criterion." *Tidd*, 118 A.3d at 9; *see Marshall*. However, that does not mean we must rubber stamp the Board's determinations concerning what is a desirable use of the Property. *Tidd*, 118 A.3d at 16 (Leadbetter, J., dissenting). While the Board states that the façades of the Existing Buildings are part of the area's history and character and that the Existing Buildings should be preserved, (F.F. No. 6, C.L. 8), and while URA's goal to preserve these buildings may be laudable, this is not the type of decision the Board is empowered to make. *See O'Neill v. Zoning Board of Adjustment of Philadelphia County*, 254 A.2d 12 (Pa.

15

1969) (*O'Neill II*). Notably, here, the LNC district in which the Property is located contains no restrictions concerning historical or architectural protections. *See* Zoning Code § 904.02. If that is the City's desire for this area, and if larger buildings are necessary to make it economically feasible to accomplish that desire, then it is the task of that branch of the City's government responsible for zoning, rather than the Zoning Board, to address the matter. *See O'Neill II*; *Hipwell Manufacturing Company v. Zoning Board of Adjustment of City of Pittsburgh*, 452 A.2d 605, 608 (Pa. Cmwlth. 1982) (stating that "policy decisions in connection with land use should be left to the elected officials"). "[T]his problem cannot and should not be remedied piecemeal by the grant of variances." *O'Neill II*, 254 A.2d at 16. "[O]nly the governing body of the municipality has the power and the responsibility under the law to embody in ordinance legislation the policy determinations which are unavoidably involved in deciding where intensive apartment development should be placed." *Lipari v. Zoning Hearing Board of City of Easton*, 516 A.2d 110, 114 (Pa. Cmwlth. 1986). In effect, the Board has deferred to URA's unilateral determination that preservation of the Existing Buildings is more in keeping with the character of the neighborhood than the legislative zoning restrictions. This is not for a property owner to decide.

Given the Variances' significant deviations from the Zoning Code, Pascal argues that Trek is really seeking a rezoning and that the Variances are not the minimum to afford relief. We find *O'Neill II* and *One Meridian Partners, LLP v. Zoning Board of Adjustment of City of Philadelphia*, 867 A.2d 706 (Pa. Cmwlth. 2005) to be instructive here.

In *O'Neill II*, the applicant sought a variance to construct a high-rise apartment building containing approximately two and one-half times the amount of floor space than was permitted under the zoning regulation. The applicant argued that the apartments' rents would be too expensive if he were constrained to build within the zoning ordinance because he would not be able to build enough apartments. The zoning board granted the variances. Eventually, the case made it to the Pennsylvania Supreme Court, and, on appeal, the applicant and the City of Philadelphia, on behalf of its zoning board, argued that the applicant's proposed building would benefit the area of the city in which it was to be built. Although the Supreme Court acknowledged that the parties' contention may well have been justified, it stated this was not the type of decision the zoning board was authorized to make. "Instead, it is the task of that branch of the … government responsible for zoning to rezone the property if it finds that larger buildings should be erected in the area." *Id*. at 16. Additionally, the Supreme Court noted the size of the deviation from the floor space requirements, approximately two and one-half times what was permitted, and reiterated that, in such a situation, the remedy appears to be a rezoning and not a variance. *Id*.

Later, in *One Meridian Partners*, the applicant sought to construct a building containing three times the amount of floor space permitted under the zoning regulations. The zoning board granted the variance based on testimony that a certain critical mass was necessary to make a luxury residential use work at the site. The zoning board had concluded that a building built strictly in accordance with the zoning regulations would not be feasible due to the high condominium fees that would result. This Court ruled that the board's conclusion was contrary to

17

the ruling in *O'Neill*, and relying on that case, we stated that it appeared the applicant's appropriate remedy would be a rezoning.

Like the applicants in *O'Neill* and *One Meridian*, Trek seeks a variance that is a significant deviation from the Zoning Code, being nearly two and one-half times that permitted with respect to the floor area ratio and being more than double that permitted with respect to height. Following the precedent of *O'Neill* and *One Meridian*, we, too, conclude that it appears Trek's appropriate remedy would be a rezoning.

Lastly, Pascal argues that the additional height and mass occasioned by the Variances would result in a detrimental effect on the character of the surrounding neighborhood. The Board concluded that any detrimental impact from the additional height and floor area ratio is outweighed by the benefits anticipated from the redevelopment of the Property. (C.L. No. 9.) However, the Board made no specific findings concerning any benefits, anticipated or otherwise. In the absence of such, the Board's mere statement of anticipated benefits is speculative and insufficient.

For the foregoing reasons, and keeping in mind that an applicant must establish *all* elements to be entitled to a variance, we conclude that Trek failed to meet its burden to prove that it was entitled to the Variances. Therefore, the Trial Court correctly reversed the Board's decision granting the Variances. Because of our disposition on the Variances, we need not address whether Trek was entitled to the Special Exception, which concerned parking related to the Project.

18

Accordingly, we affirm the decision of the Trial Court.

_____
JULIA K. HEARTHWAY, Judge

Judge McCullough did not participate in the decision of this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Demko, an individual, and  :
Stephen Pascal, an individual    :
                                     :
         v.                   :  No. 646 C.D. 2016
                                     :
City of Pittsburgh Zoning Board of  :
Adjustment, and Trek Development  :
Group, Inc.                     :
                                   :
         v.                   :
                                   :
The Urban Redevelopment Authority :
of Pittsburgh, and City of Pittsburgh  :
                                   :
Appeal of: Trek Development Group, :
Inc., The Urban Redevelopment    :
Authority of Pittsburgh and the City  :
of Pittsburgh                   :

## O R D E R

AND NOW, this 7th day of March, 2017, the order of the Allegheny County Court of Common Pleas is hereby affirmed.

_____
JULIA K. HEARTHWAY, Judge