# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard Stat and Randall F. Bishop,    :
Appellants    :
   :
v.    :   No. 888 C.D. 2018
   :   Argued:  September 9, 2019
Kennett Township Zoning Hearing    :
Board    :

BEFORE:    **HONORABLE RENÉE COHN JUBELIRER,** Judge
              **HONORABLE ELLEN CEISLER,** Judge
              **HONORABLE BONNIE BRIGANCE LEADBETTER,** Senior Judge

<u>**OPINION NOT REPORTED**</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**             **FILED: November 7, 2019**

Richard Stat and Randall F. Bishop (Objectors)[1] appeal from the May 29, 2018 Order of the Court of Common Pleas of Chester County (common pleas) that denied Objectors' appeal from the Decision of the Kennett Township Zoning Hearing Board (Board) and affirmed the Board's grant of a dimensional variance to Chester Water Authority (Authority). On appeal, Objectors argue that the Board erred or abused its discretion in:  not finding that the Authority's proposed use required a special exception or conditional use permit; applying the wrong legal

---

[1] On April 3, 2019, counsel for Objectors filed with the Court a "Suggestion of Death of Appellant, Randall F. Bishop," advising the Court that Mr. Bishop had passed away and that a personal representative had not yet been appointed. No additional information has been filed with the Court regarding this issue.

standard in approving the dimensional variance; and granting the dimensional variance where the Authority had not met its burden of proving its entitlement to that relief.[2]

## I. Background

### A. *Facts*

The Authority is a municipal authority organized under the Municipality Authorities Act[3] and is responsible for providing public water services to governmental units and individuals in Delaware and Chester Counties. The Authority owns a 5.4-acre property (Property) located in the SA-Specialized Agricultural District (SA district) in Kennett Township (Township). It has operated facilities on the Property since 1975, when it received a special exception from the Board to construct a pumping station. (Reproduced Record (R.R.) at 196a-201a.) That special exception was necessary because the "pumping station" use was not set forth in the Township Zoning Ordinance (Ordinance),[4] but the Ordinance did allow for a "public water supply"[5] use as of right. (*Id.* at 48a.) In 1989, the Authority received approval to add a water storage tank and distribution system booster station, with generator, to the Property. (*Id.* at 202a-05a.) The Authority's neighbors in the SA district are primarily mushroom houses, but Mr. Bishop's residential property is immediately adjacent to the Property. Pursuant to

---

[2] We have rearranged the arguments for ease of discussion.

[3] 53 Pa. C.S. §§ 5601-5623.

[4] The relevant sections of the Ordinance are set forth in Appendix D to Objectors' brief.

[5] Township's Zoning Officer testified this permitted use was defined as "[w]ater distributed and furnished by or through the agency of a municipality or privately owned water company subject to inspections and regulations by the Pennsylvania Department of Health." (R.R. at 48a.)

the Ordinance, mushroom farms and greenhouses in the SA district are permitted 70 percent impervious lot coverage, but other uses in that district, including the Authority's use, are limited to 20-percent impervious lot coverage.

At issue is an application the Authority filed with the Board to expand its facilities on the Property to include a 1.5-million-gallon storage tank, a bulk water filling station, an emergency generator, an enclosed garage for Authority vehicles, a fuel filling station, and a two-story office building. The Authority initially sought a special exception in addition to a dimensional variance from the 20-percent lot coverage restriction. Following a description, at a hearing, of the Authority's historic and preexisting use of the Property and the 1975 and 1989 approvals of that use, Township's Zoning Officer stated that the proposed use did not require a special exception, and the Authority withdrew its special exception request. (*Id.* at 47a-51a.) Thus, the only part of the application that remained before the Board was the dimensional variance request. The variance was required because the proposed plans would result in lot coverage of 26.43 percent, which would "slightly exceed the maximum lot coverage permitted in the SA . . . [d]istrict." (Application, R.R. at 7a.)

The Authority presented the testimony of its Executive Manager (Manager) and its Engineer, as well as an Outside Engineer, who explained the Authority's purpose, its current use of the Property, the proposed plan, and why the expansion and dimensional variances were needed. Based on that testimony, the Board made the following findings of fact.

The Authority serves 13 communities and provides wholesale water service to 7 customers, with a total of 65,000 properties served. The Authority's existing facilities on the Property serve about 2100 customers in 3 municipalities, including

3

Township, and provide wholesale water to the Borough of Kennett Square (Borough). The new water storage tank would be 35 feet high, painted, and located on the portion of the Property that is adjacent to mushroom farms. That tank is needed to satisfy current customer requirements, to serve the anticipated population growth in the service area, to have an emergency backup system, and to provide water for local firefighting services. The "tank will better serve to provide water for three days in the event there is an interruption in the water main" that bisects the Property. (Board Decision, Finding of Fact (FOF) ¶ 16.) The proposed bulk water filling station is designed, primarily, to fill fire company tankers, but is also available to others that may need bulk water. The new emergency generator is intended to support the existing pump station, would be operated by propane, and would be "housed in an acoustic enclosure with a critical grade silencer muffler." (*Id.* ¶ 21.) The only sound that would emanate from that enclosure would be similar to that of a dishwasher.

The Authority proposed to close its current leased office space, located in the Borough, and open an office on the Property. That office would be staffed by two employees from 9:00 a.m. to 5:00 p.m., who would accept customer payments and process new applications. The Authority estimated that 20 to 25 customers would use the office a week. The second story of the office would "be used for emergency operations for disaster events." (*Id.* ¶ 19.) The proposed enclosed parking garage would be used to park a portion of the Authority's service vehicles, all of which are currently located in the City of Chester (Chester). Those vehicles would be used by Authority employees, who would come to the Property in their personal vehicles, park, take the Authority vehicles to attend to their duties, and then return at the end of the day. The Authority needs to have vehicles on the

Property to improve its response time, which, currently, is between 45 minutes to 1 hour due to the vehicles' location in Chester. The proposed fueling station would be a more efficient means of fueling the Authority's vehicles and would receive fuel deliveries every six to eight weeks.

The Authority anticipated construction of the facilities would occur over three to four years in order to reduce the costs to its water customers. The Board noted the Authority's concession that there were sight distance issues with the current plan, and that the Authority still would have to obtain land development approval, which would require the Authority to meet the Subdivision and Land Development Ordinance's requirements, including landscaping of the existing and proposed facilities. Township's Board of Supervisors was in favor of the proposed plan.

Objectors, who were granted party status by the Board, and others, questioned the Authority's witnesses and provided their own testimony. Objectors' complaints focused on the plan's visual appearance, the potential increase in traffic and noise, and the increase in the number of activities on the Property. The current stormwater management basin drains onto Mr. Bishop's property, which he believed was causing erosion. Mr. Bishop also objected to how close the existing storage tank was to his property. Mr. Stat questioned the withdrawal of the special exception request, contending that the proposed use was different from the current use. However, Mr. Stat was advised this issue was no longer before the Board because the special exception request had been withdrawn.

### B. The Board's Decision

Based on the above findings of fact and its interpretation of the Ordinance, the Board held that the Authority had met the requirements for obtaining a

variance, noting that the Authority was requesting a "hybrid variance which require[d] a less strict compliance with the variance standards of the [Ordinance] and the Pennsylvania Municipalities Planning Code"[6] (MPC). (Board Decision at 8 (citing *Pohlig Builders, LLC v. Zoning Hearing Bd. of Schuylkill Twp.*, 25 A.3d 1260 (Pa. Cmwlth. 2011)).) The Board concluded that the Authority's additions to its "municipal authority use on the Property" were necessary to allow the Authority "to provide a better level of service and an adequate supply of potable water to the public, to fire companies, and continuity of supply in the event of an emergency." (*Id.*) According to the Board, the existing and proposed facilities were "integral parts of the Authority's public water service operations." (FOF ¶ 31.) The Board gave "great weight" to the public service component of the Authority's operations in its consideration of the variance request. (Board Decision at 8.)

The Board found that the current impervious coverage of the Property is 7.94 percent, or 16,636 square feet, and the proposed plan would add 38,741 square feet of impervious coverage, for a total of 55,377 square feet. (FOF ¶¶ 32-34.) The allowed impervious coverage under the Ordinance was 41,905 square feet; thus, the proposed lot coverage was approximately 13,472 square feet, or 6.43 percent, more than the Ordinance's limit. (*Id.* ¶ 34.) Comparing the proposed lot coverage, 26.43 percent, to the permitted 70 percent lot coverage of the mushroom farms neighboring the Property, the Board found that 6.43 percent "seem[ed] to be an insignificant addition of impervious coverage." (Board Decision at 8.) It held the 20-percent lot coverage provision "restrict[ed] the [Authority's] ability to continue to make reasonable use of the Property; that is, it restrict[ed] the Authority from doing what is necessary in order to carry out its public water

---

[6] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101 - 11202.

6

supply obligations and responsibilities." (*Id.*) This, the Board concluded, "create[d] a hardship on the Authority." (*Id.*)

Further, the Board determined that "granting the variance will not affect the surrounding community[,] which is mostly agricultural and occupied by mushroom houses," (Board Decision at 9), "alter the essential character of the zoning district in which the Property is located," or "substantially or permanently impair the appropriate use or development of [the] adjacent nonresidential property or the residential property," as "long as there is a sufficient landscape buffer installed adjacent to the residential property," (FOF ¶¶ 40-41). The Board further observed that, other than Mr. Bishop's property, the Authority's neighbors in the SA district are mushroom farms. (Board Decision at 8-9.) Finally, it found that approving the variance would "not be detrimental to the public welfare." (FOF ¶ 42.) Accordingly, the Board granted the variance, but imposed seven conditions on that approval.[7] Those conditions included that: the Authority had to obtain the necessary approvals for its land development plan, which had to comply with the required design standards, including for landscaping, lighting, noise, signage, and driveway sight distance; the stormwater drainage plan had to address issues with stormwater discharge onto adjacent properties; the Authority had to install a landscape buffer adjacent to the residential property; and the Authority's vehicles had to be parked within the proposed garage and no maintenance, other than minor maintenance, on those vehicles was permitted.

---

[7] The Board imposed two other conditions: the Authority's operations and activities on the Property had to be in accordance with the evidence presented at the hearing; and the conditions related to the limitation of access to the Property and noise levels set forth in the 1975 decision remained. (Board Decision at 9-10.)

7

*C. Common Pleas' Decision*

Objectors appealed to common pleas essentially raising two challenges. First, Objectors challenged the Board's characterization of the Authority's use of the Property, arguing the Board erred or abused its discretion when it held that the Authority was engaged in a permitted "municipal authority use" on the Property where the Ordinance contains no such use, instead of finding that the Authority's proposed use was a "public use," which is not permitted in the SA district. It further erred when it did not require the Authority to obtain a conditional use approval for the proposed use. Second, Objectors challenged the Board's grant of the dimensional variance, arguing the Board should not have applied the relaxed "hybrid standard" and the Authority did not meet all of the requirements for obtaining the variance, particularly that it would suffer unnecessary hardship if the dimensional variance was denied. Objectors argued, citing *Township of East Caln v. Zoning Hearing Board of East Caln Township*, 915 A.2d 1249, 1254 (Pa. Cmwlth. 2007), that the Board erred in granting the variance based solely on the expansion being in the public's interest.

Common pleas affirmed the Board and resolved Objectors' arguments as follows. With regard to the first argument, common pleas found that, in using the phrase "municipal authority use," the Board was "simply characterizing the type of use that [the Authority] was engaged in on the Property" and "describing the type of services that [the Authority] provided to the public," not legally defining that use. (Common Pleas' Opinion, May 29, 2018 (May 29, 2018 Op.), at 8-9.) Common pleas observed that the "minor public utility" use cited by Objectors was not added to the Ordinance until 2007, after the Authority's permitted use of the Property began. Further, common pleas held, *inter alia*, that, because the

8

Authority withdrew its request for a special exception, this issue was not before the Board and was not subject to appeal to common pleas.

With regard to the variance, common pleas discerned no error in the Board's application of a relaxed standard in reviewing the Authority's dimensional variance request. (May 29, 2018 Op. at 5-6 (citing *Hertzberg v. Zoning Bd. of Adjustment*, 721 A.2d 43, 47 (Pa. 1998); *Segal v. Zoning Hearing Bd. of Buckingham Twp.*, 771 A.2d 90, 94 (Pa. Cmwlth. 2001)).) Citing *Hertzberg*, and after setting forth the Ordinance's standards for granting a variance, which exclude financial gain as a basis for that relief, common pleas determined the Authority had established the requisite hardship for obtaining a dimensional variance. (May 29, 2018 Op. at 6 (citing Sections 240-2306.C, 240-2306.D of the Ordinance).) Common pleas held the Board did not base its finding of hardship solely on the project being in the public's interest, but its decision was based on substantial evidence that "demonstrated not only the existence of a hardship but also that the Property cannot be developed in strict conformity with the . . . Ordinance provisions." (*Id.* at 7.) It noted that the Authority had owned and used the Property as part of its facilities since 1975, long before the imposition of the 20-percent lot coverage restriction, making the preexisting permitted use constrained by the Property's physical conditions. The Authority, common pleas concluded, provided essential public water services to the public and, due to the population growth and the need for fire and emergency backup services in the area, the grant of the variance was not inconsistent with the Ordinance's requirements or contrary to the public health, safety, and welfare. Thus, common pleas held the Authority did not create its hardship. Like the Board, common pleas cited the lot coverage disparity in the SA district as support for the conclusion that the proposed

9

expansion would not alter the essential character of the zoning district or impair the use of the nonresidential properties. Common pleas held that the effect on the residential properties would be addressed by the Board's conditions. Accordingly, common pleas affirmed.

Objectors appealed, and common pleas directed them to file a Concise Statement of Errors Complained of on Appeal (Statement) pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b). Objectors did so, raising nine issues for common pleas' review. Common pleas held that these issues were addressed in its May 29, 2018 Opinion. Common pleas also explained, however, that one of the errors asserted in the Statement, that the Authority did not meet the requirements for obtaining a variance, was too vague because it did not identify which requirement was not satisfied. (1925(a) Op. at 5.) Thus, common pleas found the issue waived. (*Id.*) Objectors' appeal is now ready for disposition by this Court.

## II. Appeal to this Court
### A. *Whether the Board Erred by Finding that a Special Exception or Conditional Use Permit was not Required.*

### i. The Parties' Arguments

Objectors first challenge the Board's and common pleas' characterization of the Authority's current and proposed use of the Property.[8] Objectors argue the Board found the Authority's current and proposed use of the Property was a "municipal authority use," which is not a use defined by the Ordinance. (Objectors' Brief (Br.) at 20.) They assert that neither the current use of the

---

[8] Objectors set forth their arguments in three separate sections in their brief, which we have consolidated.

10

Property, nor the proposed plan, constitute a "minor public utility facility," which is a permitted use in the SA district, but is a "public use," which is not a permitted use in the SA district.[9] (*Id.* at 21-22.) Therefore, Objectors contend, the Board erred in concluding the Authority's current use and proposed use are permitted uses in the SA district.

The Authority responds that the Board's reference to "municipal authority use" was merely a characterization of the type of use taking place on the Property and was not intended to legally define that use in accordance with the Ordinance. (Authority's Br. at 20.) According to the Authority, the Board made no finding or legal conclusion regarding the Authority's use, nor could it, because the Authority withdrew its request for a special exception and, therefore, the only relief requested was the grant of a dimensional variance. Because the dimensional variance did not require the Board to make any determination regarding the Authority's use of the Property, the Board did not address that issue, rendering that issue, the Authority asserts, not properly before this Court.

### ii. Discussion

Objectors' arguments are, in effect, that a special exception or conditional use permit was necessary here. However, we have held that a zoning hearing

---

[9] The Ordinance defines "minor public utility facility" as "an enclosed facility designed to provide limited utility services to the local community or part thereof and is operated by a local municipality, a municipal authority organized by such municipality, a public corporation or association, or an entity subject to the jurisdiction of the Pennsylvania Public Utility Commission." (Section 240-201 of the Ordinance.) "This definition includes . . . water and sewage pumping stations." (*Id.*) A "public use" is defined as "any building, structure, facility, complex or area used by the general public or which provides a service to the public, whether constructed by a state, county, federal, municipal or governmental agency or authority other than that of Kennett Township." (*Id.*)

board's jurisdiction to issue determinations is limited to the relief requested by an applicant in an appeal from a zoning officer's determination granting or denying a permit or a request for a variance or special exception. *Joe Darrah, Inc. v. Zoning Hearing Bd. of Spring Garden Twp.*, 928 A.2d 443, 446-47 (Pa. Cmwlth. 2007) (without a request for specific relief, a zoning hearing board lacks the authority to interpret an ordinance and any such interpretation would be an impermissible advisory opinion). A zoning hearing board cannot render advisory opinions regarding the interpretation of an ordinance or legality of a use, and a zoning hearing board's discussion of issues not properly before it are nonprecedential dicta. *In re Chester Cty. Outdoor, LLC*, 64 A.3d 1148, 1151-52 (Pa. Cmwlth. 2013).

Here, the Authority initially requested both a dimensional variance and a special exception. However, at the hearing, evidence was presented regarding the prior approvals of the Authority's initial special exception for a pumping station in 1975 and the expansion of that use in 1989, both of which preceded the addition of the definition of "minor public facility use." (R.R. at 48a-49a.) Based on that evidence, and the Zoning Officer's statement that no special exception was needed, the Authority withdrew its special exception request on its understanding that its ongoing use of the Property, along with its proposed use, were protected under those prior approvals. (*Id.* at 50a.) The Authority's withdrawal of its special exception request removed the issue of whether the Authority's use of the Property was permissible from the Board's consideration. *Joe Darrah, Inc.*, 928 A.2d at 446-47. Therefore, any discussion by the Board related to whether a special exception would have been required, granted, or denied would have been dicta and not precedential. *In re Chester Cty. Outdoor, LLC*, 64 A.3d at 1151-52. As that

12

issue was not before the Board, it is likewise not properly before this Court for resolution at this time.

    *B. Whether the Board Applied the Wrong Legal Standard for a Dimensional Variance.*

    i. <u>The Parties' Arguments</u>

Objectors next argue the Board erred in applying the "much less stringent" "hybrid standard" set forth in *Pohlig Builders* when it reviewed the Authority's dimensional variance request. (Objectors' Br. at 10.) *Pohlig Builders* did not involve a dimensional variance and, therefore, Objectors assert, using the standard described therein to analyze the Authority's dimensional variance was erroneous. The Authority replies that Objectors' emphasis on the label the Board gave to the Authority's variance request does not alter the fact that the Authority met its burden of proof under the relaxed standard set forth in *Hertzberg*.

    ii. <u>Discussion</u>

Here, the Board indicated that the variance requested was a hybrid variance governed by the unnecessary hardship standard described in *Pohlig Builders*. (Board Decision at 8.) *Pohlig Builders* involved a variance request from the constraints imposed on the development on steep slopes, which has been held to be neither a use nor a dimensional variance. 25 A.3d at 1267. This scenario, we held, fell into a gray area, and, therefore, required a "hybrid" analysis that included applying a less stringent hardship requirement. *Id.* While Objectors describe the standard set forth in *Pohlig Builders* as being a "hybrid standard," this Court explained in that case that the hardship standard applied in that case was "the relaxed *Hertzberg* standard." *Pohlig Builders*, 25 A.3d at 1269. In other words, what was "hybrid" in *Pohlig Builders* was not the **standard** applied, but the **type**

of variance requested due to the nature of steep slope requirements. It is not disputed that "the relaxed *Hertzberg* standard," *id.*, is applicable to dimensional variance requests or that this standard requires a lesser quantum of proof to establish unnecessary hardship, *Hertzberg*, 721 A.2d at 48, 50. Accordingly, while the Board called the variance requested from the Ordinance's lot coverage provisions here a "hybrid variance" where it is really a dimensional variance, *Segal*, 771 A.2d at 94, that label is of no moment because **both** types of variances **are analyzed using the more relaxed standard** set forth in *Hertzberg*. *Hertzberg*, 721 A.2d at 50; *Pohlig Builders*, 25 A.3d at 1269.

### C. Whether the Board Erred or Abused its Discretion in Granting the Variance.

#### i. The Parties' Arguments

Finally, Objectors argue the Board erred in finding that the Authority had met all of the requirements for obtaining a dimensional variance, including that it would suffer unnecessary hardship if the variance was denied. In response to common pleas' conclusion that Objectors' challenge to the non-hardship requirements was waived, Objectors contend the issue was the same issue they raised in their appeal and was fully addressed by common pleas in its May 29, 2018 Opinion. Thus, no waiver has occurred. On the merits, Objectors argue the Ordinance's requirements for granting a variance were not met because there is no evidence that: there were any unique or irregular conditions on the Property; the Property could not be developed in conformity with the 20-percent lot coverage restriction; or the Authority would suffer hardship if its variance was denied. According to Objectors, the Board made no findings that the Property had any physical constraints or that the Property could not be reasonably used in the absence of the variance. Objectors contend the Board's reliance on the public's

14

interest or the public health, safety, and welfare to justify granting the variance is contrary to the holding in *East Caln*, which rejected the argument that public interest alone is sufficient to grant a variance. They further argue the Board's finding of unnecessary hardship is insufficient, and the Authority's desire to maximize the development and use of the Property does not constitute unnecessary hardship, even under the relaxed *Hertzberg* standard.

The Authority argues Objectors have waived their challenge to the non-hardship requirements for a dimensional variance due to the vagueness of their Statement. Notwithstanding that waiver, the Authority argues the Board's conclusion that it met the Ordinance's requirements for obtaining a dimensional variance is supported by substantial evidence, particularly where dimensional variances are "of lesser moment than the grant of a use variance" and require a lesser quantum of proof to establish unnecessary hardship, *Hertzberg*, 721 A.2d at 50. The Authority maintains it established it will experience unnecessary hardship if the dimensional variance is denied and its proposed plan is not motivated by a desire for financial gain, but by its duty to provide public water services. Citing *Wagner v. City of Erie Zoning Hearing Board*, 675 A.2d 791 (Pa. Cmwlth. 1996), the Authority contends the salutary purpose of its proposed plan, which would benefit the public good, justified the Board's less stringent application of the Ordinance's variance requirements. However, the Board did not, the Authority asserts, rely solely on the public benefit of the proposed plan to find unnecessary hardship, but also examined the characteristics of the neighborhood, which is a valid consideration under *Hertzberg*. When this factor is considered, the Authority argues, the Board's conclusion is supported by the disparity in the lot coverage requirements on the Authority and the lot coverage limitation on the neighboring

15

mushroom farms. It is the 20-percent lot coverage limitation, which was imposed after the Authority began its operations on the Property, that hinders the Authority's ability to improve its preexisting use of the Property. Finally, at oral argument before this Court, the Authority observed that the requested deviation from the 20-percent lot coverage requirement was *de minimis* in nature.

### ii. General Legal Principles for Reviewing a Zoning Appeal

There are certain general legal principles involved in reviewing a zoning appeal. First, here, because common pleas did not take any evidence, we review the decision of the Board, not that of common pleas. *Bd. of Supervisors of Upper Southampton Twp. v. Zoning Hearing Bd. of Upper Southampton Twp.*, 555 A.2d 256, 258 (Pa. Cmwlth. 1989). Second, a zoning hearing board abuses its discretion if its findings of fact are not supported by substantial evidence, which is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *POA Co. v. Findlay Twp. Zoning Hearing Bd.*, 713 A.2d 70, 75 (Pa. 1998). Third, "[t]he role of the zoning hearing board is that of fact-finder. A reviewing court may not substitute its judgment for that of the zoning hearing board; rather, the court is bound by the zoning hearing board's determinations of witness credibility and evidentiary weight." *In re Rural Route Neighbors*, 960 A.2d 856, 860 (Pa. Cmwlth. 2008) (citation omitted).

### iii. Ordinance's Variance Provisions

Section 240-2306.C of the Ordinance addresses the standards for granting variances and provides:

> C. The Zoning Hearing Board may grant a variance to a provision of this chapter provided the following standards are satisfied **where relevant in a given case**:

16

(1) Unique or irregular conditions. Where unique physical circumstances or conditions exist, including irregularity, narrowness or shallowness of lot size or shape, or exceptional topographic conditions peculiar to the particular property. The hardship must be created by such conditions and not the circumstances or conditions generally created by the provisions of this chapter in the district in which the property is located.

(2) Strict conformity cannot occur. Because of the physical circumstances or conditions described in § 240-2306[.]C(1), there is no possibility that the property can be developed in strict conformity with the applicable provisions of this chapter and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.

(3) Liability of the applicant. Where such unnecessary hardship described in § 240-2306[.]C(1) has not been created by the applicant subsequent to the adoption of this chapter or prior ordinance and that strict application of the provisions of this chapter would deprive the applicant of the reasonable use of the land, structure or building.

(4) Effect of the variance on the district. Where the variance, if authorized, will not alter the essential character of the zoning district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.

(5) Minimum variance. Where the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation at issue.

(Section 240-2306.C of the Ordinance (emphasis added).)[10] Section 240-2306.D states that "[f]inancial gain shall not be a basis for granting a variance." (Section 240-2306.D of the Ordinance.) Objectors argue the Authority did not meet these

---

[10] The Ordinance's requirements track those found in Section 910.2 of the MPC, which was added by Section 89 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2.

requirements and the Board did not address all of these requirements in its Decision. The Authority argues Objectors waived any challenge to the non-hardship requirements and that, on the preserved challenge, it met its burden of establishing the requisite hardship to obtain the dimensional variance.

iv. <u>Whether Objectors Waived Their Challenge to the Non-Hardship Requirements of the Ordinance.</u>

Common pleas found that Objectors waived their challenge to whether the non-hardship requirements were met because their Statement did not specify which of the Ordinance's requirements were unmet. Thus, it found their Statement was too vague to allow review. (1925(a) Op. at 5.) The issue in question, as stated by Objectors in their Statement was whether common pleas "committed an error of law and/or abused its discretion in affirming the Board by concluding that [the Authority] had satisfied all of the requirements necessary for the grant of a variance." (Statement ¶ 2(d).)

Pennsylvania Rule of Appellate Procedure 1925(b)(4)(ii), (vii) requires that an appellant's "Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge" and provides that "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(ii), (vii). Rule 1925(b) is intended to aid the trial court in identifying and focusing only on those issues that the parties plan to raise on appeal. *Commonwealth v. Lord*, 719 A.2d 306, 308 (Pa. 1998). Therefore, a 1925(b) Statement must contain a sufficiently concise and coherent statement of issues to enable common pleas to identify the issues to be raised on appeal. *Jiricko*

18

*v. Geico Ins. Co.*, 947 A.2d 206, 210 (Pa. Super. 2008).[11]  A 1925(b) Statement that is too vague to allow the court to identify the issues to be raised on appeal is the functional equivalent of no statement at all.  *Commonwealth v. McCandless*, 880 A.2d 1262, 1269 (Pa. Super. 2005).

Objectors' Statement does not specify which of Section 204-2306.C's variance requirements were unsatisfied, other than the unnecessary hardship requirement.  Thus, it could be said that the Statement did not satisfy Rule 1925(b)'s specificity requirements.  However, Rule 1925(b)(4)(v) also provides that "[e]ach error identified in the Statement will be deemed to include every subsidiary issue contained therein which was raised in the trial court . . . ."  Pa.R.A.P. 1925(b)(4)(v).  A review of Objectors' arguments to common pleas reflects that they raised a similarly broad challenge to whether the Authority satisfied all of the requirements of the Ordinance for obtaining a variance at that time.  (May 29, 2018 Op. at 4.)  Common pleas addressed each Ordinance requirement in its May 29, 2018 Opinion, concluding the Board did not err in granting the variance.  (*Id.* at 5-8.)  Thus, the error now claimed to be vague was raised before and addressed by common pleas in its May 29, 2018 Opinion and, therefore, is not waived for lack of specificity.  Pa.R.A.P. 1925(b)(4)(v).

  v. Whether a Variance from the Lot Coverage Requirement was Properly Granted.

Although we have set forth Objectors' arguments regarding the deficiencies in the Board's decision and in the Authority's evidence, we need not address them because, even if those arguments were to have merit, it is well settled that appellate

---

[11] Although not binding, we may consider decisions of the Superior Court for their persuasive value.  *Lerch v. Unemployment Comp. Bd. of Review*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

19

courts review judgments, not reasons. Thus, "this Court may affirm for any reason and is not limited to grounds raised by the parties." *McAdoo Borough v. Pa. Labor Relations Bd.*, 485 A.2d 761, 764 n.5 (Pa. 1984); *see also Mun. Auth. of Borough of W. View v. Pa. Pub. Util. Comm'n*, 41 A.3d 929, 934 n.7 (Pa. Cmwlth. 2012) (same) (citing *McAdoo*, 485 A.2d at 764 n.5). Where a "ruling, order, decision, judgment or decree" is correct, "but . . . an erroneous reason" is given, "an [a]ppellate [c]ourt will affirm the action . . . below and assign the proper reason therefore." *Bearoff v. Bearoff Bros., Inc.*, 327 A.2d 72, 76 (Pa. 1974); *see also Epting v. Marion Twp. Zoning Bd.*, 532 A.2d 537, 543 (Pa. Cmwlth. 1987) (citing *Bearoff*, 327 A.2d at 76). This legal doctrine is sometimes referred to as the "right for any reason doctrine." *In re A.J.R.-H.*, 188 A.3d 1157, 1176 (Pa. 2018).[12] This doctrine is "applicable to judicial review of agency determinations." *Epting*, 532 A.2d at 543. The right for any reason doctrine is appropriate only "where the correct basis of the ruling, order, decision, judgment or decree is clear upon the record." *In re A.J.R.-H.*, 188 A.3d at 1176 (quoting *Bearoff*, 327 A.2d at 76). Where there are disputed facts, "appellate courts should refrain from assuming the role of fact-finder in an attempt to sustain the action . . . below." *Id.* "It may not be used to affirm a decision when the appellate court must weigh evidence and engage in fact finding or make credibility determinations to reach a legal conclusion." *Id.*

---

[12] While it appears the question of whether our Supreme Court has the ability to apply this doctrine in discretionary appeals is "unsettled," the doctrine's use by the intermediate appellate courts is settled. Justice Thomas G. Saylor, *Right for Any Reason: An Unsettled Doctrine at the Supreme Court Level and an Anecdotal Experience With Former Chief Justice Cappy*, 47 Duq. L. Rev. 489, 492 (2009).

For the reasons that follow, we conclude the Board was correct in granting a variance allowing the Authority to exceed the 20-percent lot coverage requirement by 6.43 percent. However, we do so on the basis that this deviation is *de minimis* in nature, as put forth by the Authority at oral argument, and the Board made the findings of fact necessary to support this determination.

In the zoning context, the *de minimis*[13] "doctrine authorizes a variance in the absence of a showing of the unnecessary hardship traditionally required to support such relief **where the violation is insignificant and the public interest is protected by alternate means**." *Nettleton v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 828 A.2d 1033, 1038 (Pa. 2003) (emphasis added). "A *de minimis* variance may be granted, even where the strict requirements for a variance have not been met, where the variation requested is minor and rigid compliance is not necessary to protect the public policy concerns of the ordinance." *Lench v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 13 A.3d 576, 581 (Pa. Cmwlth. 2011). The burden on the "applicant is at its lightest where the request involves a *de minimis* variance with respect to a dimensional variance . . . ." *Id.* at 582. "There are no set criteria for determining what constitutes a *de minimis* variance; this determination depends upon the circumstances of each case." *Id.* Courts have found that a dimensional change of less than 10 percent can be *de minimis*. *Id.* For example, a 5.82 percent deviation from a height restriction, *id.*, and the addition of square footage to a building resulting in a 6.76 percent deviation from the maximum building lot coverage, *Township of Middletown v. Zoning Hearing*

---

[13] "'*De minimis non curat lex*' is the legal maxim meaning that the law does not care for small or trifling matters." *Nettleton v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 828 A.2d 1033, 1038 n.5 (Pa. 2003).

21

*Board of Middletown Township*, 682 A.2d 900, 901-02 (Pa. Cmwlth. 1996), were determined to be *de minimis*. *See also Pyzdrowski v. Bd. of Adjustment of the City of Pittsburgh*, 263 A.2d 426 (Pa. 1970) (7 percent deviation from side yard setback was *de minimis*); *Laskowski v. W. Chester Borough Zoning Hearing Bd.* (Pa. Cmwlth., No. 1902 C.D. 2012, filed July 11, 2013), slip op. at 5-6 (10 percent deviation from maximum building height requirement was *de minimis*);[14] *Appeal of Ressler Mill Found.*, 573 A.2d 675 (Pa. Cmwlth. 1990) (7 percent deviation from lot width requirement was *de minimis*). While the size of the proposed deviation is a consideration, whether rigid compliance with an ordinance's requirements "is necessary to preserve the public interests sought to be protected by the ordinance" is also important. *Township of Middletown*, 682 A.2d at 902. The imposition of conditions on a *de minimis* variance is a valid means of addressing the impact of granting the variance. *Id.* "Where the *de minimis* doctrine applies, there is no need to resort to any other theory of relief." *Pequea Township v. Zoning Hearing Bd. of Pequea Twp.*, 180 A.3d 500, 504 (Pa. Cmwlth. 2018).

In the Authority's application, it characterized the proposed lot coverage of 26.43 percent as "**slightly** exceed[ing] the maximum lot coverage permitted in the SA . . . [d]istrict." (R.R. at 7a (emphasis added).) At oral argument, the Authority argued this deviation was really *de minimis* in nature. After reviewing the evidence, the Board found the 6.43 percent deviation was "an **insignificant addition** of impervious coverage," particularly given the 70-percent lot coverage authorized for other uses in the SA district. (Board Decision at 8 (emphasis added).) The Board further found that "granting the variance **will not**[:] **affect the**

---

[14] *Laskowski*, an unreported opinion of this Court, is cited for its persuasive authority in accordance with Section 414(a) of our Internal Operating Procedures, 210 Pa. Code § 69.414(a).

22

**surrounding community**[,] which is mostly agricultural and occupied by mushroom houses," (Board Decision at 9); "**alter the essential character of the zoning district** in which the Property is located"; or "**substantially or permanently impair** the appropriate use or development of **[the] adjacent nonresidential property or the residential property**," as "long as there is a sufficient landscape buffer installed adjacent to the residential property," (FOF ¶¶ 40-41 (emphasis added)). The Board further found that approving the variance would "**not be detrimental to the public welfare**." (*Id.* ¶ 42 (emphasis added).) Last, and importantly, the Board **imposed conditions** on its approval of the variance to address concerns that were raised during the hearing. (Board Decision at 9-10.) Through these findings and imposition of conditions, the Board essentially determined that "the violation [was] insignificant," that "the public interest [was] protected by alternative means," *Nettleton*, 828 A.2d at 1038, and that "rigid compliance [wa]s not necessary to protect the public policy concerns," *Lench*, 13 A.3d at 581. These findings are those, as required by Section 240-2306.C of the Ordinance, that are **relevant to** and needed for granting a *de minimis* variance, and, therefore, it is clear from the record that the grant of the variance to the Authority on this basis is warranted. Therefore, we affirm the grant of the variance from the Ordinance's 20-percent lot coverage requirement on this alternative basis.

## III.  Conclusion

Because it is clear from the record and the Board's finding that the grant of the variance from the Ordinance's lot coverage requirements was correct, we affirm.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Richard Stat and Randall F. Bishop,   :
                Appellants   :
  :
           v.   :    No. 888 C.D. 2018
  :
Kennett Township Zoning Hearing   :
Board   :

## O R D E R

NOW, November 7, 2019, the Order of the Court of Common Pleas of Chester County is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge